## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Paul Toomey, as representative of a class of similarly situated persons, and on behalf of the DeMoulas (Restated) Profit Sharing Plan and Trust, <br><br> Plaintiff, <br> v. <br><br> DeMoulas Super Markets, Inc., Arthur T. Demoulas, William F. Marsden, and William J. Shea, <br><br> Defendants. | Case No. _____ <br><br><br> **COMPLAINT** <br><br> **CLASS ACTION** |

### NATURE OF THE ACTION

1.       Plaintiff Paul Toomey, as representative of the Class described herein and on behalf of the DeMoulas (Restated) Profit Sharing Plan and Trust (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants DeMoulas Super Markets, Inc., ("DeMoulas"), and Arthur T. Demoulas, William F. Marsden, and William J. Shea (the "Trustees") (collectively with DeMoulas, "Defendants"). As described herein, Defendants have breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiff brings this action to remedy this unlawful conduct and to obtain appropriate monetary and equitable relief as provided by ERISA.

### PRELIMINARY STATEMENT

1.       As of the first quarter of 2019, Americans had approximately $8.3 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT

COMPANY INSTITUTE, *Retirement Assets Total $29.1 Trillion in First Quarter 2019* (June 19, 2019) *available at*, *available at* https://www.ici.org/research/stats/retirement/ret_19_q1.

2.      To protect Americans' retirement savings, ERISA imposes strict fiduciary duties upon retirement plan fiduciaries. *See* 29 U.S.C. § 1104(a)(1). These fiduciary duties include a duty to exercise appropriate "care, skill, prudence, and diligence" in managing the plan's investment options, *see* 29 U.S.C. § 1104(a)(1), and are considered "the highest known to the law." *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. V. State St. Bank & Tr. Co.*, 931 F. Supp. 2d 296, 304 (D. Mass. 2013).

3.      Defendants did not prudently manage the Plan's investment options. In a typical defined contribution plan, the fiduciary will create a "menu" of investment options designed to meet a wide range of needs, allowing participants to determine which investments on the menu are best suited for them and how much money to invest in each option. However, instead of following this almost universally-adopted approach, Defendants elected to adopt a one-size fits all approach. Specifically, Defendants offered only a single investment option in the Plan (which consisted of a pre-determined mix of underlying investments) and locked Plan participants into that investment, without regard to their age, anticipated retirement date, or individual preferences or needs.

4.      Unfortunately for participants, the one-size-fits-all investment strategy designed by Defendants was not a prudent one. To the contrary, it was wildly unsuccessful.  ***Out of 674 similarly-sized retirement plans across the country, the plan performed worse – far worse – than any other plan during the class period***, ***with returns that were significantly below even the lowest decile*** of such plans.

5.     These abysmal returns were not the result of coincidence or bad luck. Rather, they are the product of a fundamentally flawed investment strategy that effectively guarantees that participants will not adequately save for retirement. The participants in a retirement plan generally have a long investment horizon—most participants won't touch the money in their account for decades, and even those participants closer to retirement need that money to last for decades into retirement, thus requiring capital appreciation for a portion of holdings. Yet contrary to the investment objectives and time horizon of the Plan's participants, and contrary to established norms that have developed based upon an understanding of those objectives, Defendants' investment approach called for investing 70% of the Plan's assets in low-returning fixed income accounts and only 30% in equities. Moreover, they failed to reach even their modest equities target almost every year throughout the statutory period, with approximately 86% of the Plan's assets invested in fixed income accounts and barely 14% in equities in 2013. As a result, participants had no meaningful opportunity for growth in their portfolios.

6.     Defendants compounded their imprudence with poor execution of their ill-advised strategy. For example, in 2014, Defendants invested ***$401,076,285, or 66% of the Plan's total assets, in cash accounts earning .05% interest or less***. Even among fixed income options, Defendants could have achieved a far higher rate of return at comparable levels of risk, but failed to do so. A prudent fiduciary would not have allowed such a large amount of Plan assets to languish in underlying cash accounts that yielded effectively no return, and were in fact losing money on an inflation-adjusted basis.

7.     Moreover, even when Defendants chose to invest in non-cash accounts, they failed to exercise appropriate care. Specifically, Defendants failed to secure the cheapest available share

class for both of the bond funds that the Plan invested in, causing participants to pay higher fees for identical versions of the same investments. For example, for at least the past six years Defendants have had approximately $20 million invested in retail shares of the Alliance Bernstein High Income Fund with an expense ratio of 0.83%, even though otherwise identical shares of the same fund charging annual expenses of only 0.50% for investors satisfying the $2 million investment minimum became available in October 2013. A prudent fiduciary engaged in a prudent monitoring process would have investigated the availability of lower cost investments and procured the lower cost, but otherwise identical, institutional shares of this fund.

8.      Based on this conduct and the other facts alleged herein, it is reasonable to infer that Defendants' process for managing the Plan's investments was flawed and inconsistent with the applicable standard of care under ERISA.   Accordingly, Plaintiff asserts a claim against Defendants for breach of their fiduciary duty of prudence (Count One), and also asserts a claim against DeMoulas for failure to monitor its appointed fiduciaries (Count Two).

## JURISDICTION AND VENUE

9.      Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10.      This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

11.      Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties

giving rise to this action occurred, and where Defendants may be found. In addition, Plaintiff Paul Toomey resides in this District.

## THE PARTIES

### PLAINTIFF

12.     Plaintiff resides in Tewksbury, Massachusetts and was a participant in the Plan from prior to the start of the class period until 2015. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. While a participant, Plaintiff was not given any choice of investments and was subject to Defendants' investment decisions. Plaintiff has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

### THE PLAN

13.     The DeMoulas (Restated) Profit Sharing Plan and Trust was established, as restated, on April 2, 1989.

14.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

15.     The Plan covers eligible employees and former employees of DeMoulas and Indian Ridge Country Club.

16.     From the end of 2013 until the end of 2017,[1] the Plan had between 11,000-13,000 participants, and between $580 million and $756 million in assets.

---

[1] 2017 is the most recent plan year for which reported Form 5500 information is available for the Plan.

17.     Participants' accounts are funded by employer contributions,[2] which are subject to a six-year vesting schedule (vesting at 20% after two years of employment and increasing 20% each year thereafter).  Employees are not permitted to contribute their own money to the Plan.

18.     The Plan includes one overarching investment that participants are automatically enrolled in. Within that investment, Defendants invest in numerous underlying investment accounts, whose combined returns equal the Plan's investment performance. Participants have no choice over how their money is invested. Instead, the Plan has a "one-size-fits-all" investment strategy which every participant is tied to. As a result, Defendants' choices are critical to participants' investment results and, ultimately, their ability to retire with adequate assets.

**DEFENDANTS**

### DeMoulas

19.     Defendant DeMoulas is headquartered in Tewksbury, Massachusetts. DeMoulas is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and is also a Plan employer. DeMoulas is a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) with respect to the Plan because it is identified in the Plan Documents and Instruments as having authority to determine the Plan's investment objectives and approve the Plan's Investment Policy Statement ("IPS"). According to the Plan's Form 5500s, DeMoulas is also the Plan Administrator, controlling and managing the operation and administration of the Plan with authority to appoint and delegate discretionary

---

[2] Employer contributions to a retirement plan are part of a standard benefits package offered by employers to attract and retain talented employees. *See* 401K SPECIALIST, *Top 4 Priorities of 401(k) Plan Sponsors* (Jan. 3, 2016) (highlighting survey findings that, among large defined contribution plan sponsors, attracting and retaining talented employees is a top priority), *available at* http://401kspecialistmag.com/top-4-priorities-of-401k-plan-sponsors; Joan Vogel, *Until Death Do Us Part: Vesting of Retiree Insurance*, 9 Indus. Rel. L.J. 183, 216 (1987) (noting that employers offer retirement benefits to attract and retain "reliable, productive employees").  They do not excuse imprudent management of a plan's assets or investments. *See Brotherston v. Putnam Invs. LLC*, 907 F.3d 17, 28-29 (1st Cir. 2018).

authority to the Trustees. Thus, DeMoulas exercises discretionary authority or discretionary control with respect to management of the Plan, as well as discretionary authority and responsibility with respect to the administration of the Plan, and is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

20.     DeMoulas is also a functional fiduciary because it has authority to appoint, monitor, remove, and replace the Trustees. All of the Trustees are DeMoulas employees who were appointed by the DeMoulas Board of Directors (the "Board"). It is well accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Kling v. Fidelity Management Trust Co.*, 323 F. Supp. 2d 132, 142 (D. Mass. 2004) ("The power to appoint fiduciaries is itself a fiduciary function.")

***The Trustees***

21.     DeMoulas delegated a portion of its fiduciary responsibilities to trustees Arthur T. Demoulas, William F. Marsden, and William J. Shea (the "Trustees"). Among other things, the Trustees are responsible for selecting and monitoring the Plan's investments. The Trustees are therefore functional fiduciaries pursuant to 29 U.S.C. § 1002(21)(A).[3] The Trustees are senior-level professional employees or officers of DeMoulas, and at all times were acting within the scope of their employment or agency with DeMoulas.

---

[3] The Trustees are also named fiduciaries pursuant to 29 U.S.C. § 1102(a) because they are identified in the Plan Documents and Instruments as having responsibility for the Plan's investments or investment managers.

## FIDUCIARY RESPONSIBILITIES

### DUTY OF PRUDENCE

22.     ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. Among other things, the statute provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

29 U.S.C. § 1104(a)(1)(B).  This is commonly referred to as the "duty of prudence."

23.     The duty of prudence includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Fiduciaries therefore may be held liable for either imprudent selection of investments or for failing to monitor a plan's investments to ensure that each remains prudent. *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

24.     The duty of prudence also includes a duty to minimize investment expenses. Indeed, "[c]ost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)).[4] Thus, selecting and retaining higher-cost investments constitutes a

---

[4] The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore, "[i]n determining the contours of an ERISA fiduciary's duty,

breach of fiduciary duties when similar or identical lower-cost investments are available. *See Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 596 (8th Cir. 2009).

25.      In considering whether a fiduciary has breached ERISA's duty of prudence, the court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 288 (D. Mass. 2008) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488(9th Cir. 1996)). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

26.      Although ERISA fiduciaries must act "in accordance with the documents and instruments governing the plan," that duty exists only "insofar as such documents and instruments are consistent with" the other duties imposed upon fiduciaries by ERISA. 29 U.S.C. § 1104(a)(1)(D).  "This provision makes clear that the duty of prudence trumps the instructions of a plan document . . . ." *Dudenhoeffer*, 143 S. Ct. at 2468.

**CONSTRUCTION OF PRUDENT INVESTMENT MENU IN DEFINED CONTRIBUTION PLANS**

27.      When considering an investment for a retirement plan, fiduciaries must give "appropriate consideration" to a range of factors, including "the opportunity for gain (or other return) associated with the investment or investment course of action."  29 C.F.R. § 2550.404a-1(b)(2)(i).  In addition, fiduciaries must consider "the role the investment or investment course of action plays in … the plan's investment portfolio," 29 C.F.R. § 2550.404a-1(b)(1)(i), and "[t]he composition of the portfolio with respect to diversification," 29 C.F.R. § 2550.404a-1(b)(2)(ii)(A).

---

courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

28.     Although many defined contribution plans offer participants a low-risk investment option that focuses on capital preservation, any such investment is only reasonably designed to be offered as "part of the portfolio," not the entire portfolio.  *See* 29 C.F.R. § 2550.404a-1(b)(2)(i). It is not prudent or appropriate to force participants into "low-yielding investments" without regard to their individual desires or needs.  *See Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 566 (D. Md. 2003).

29.     To ensure a sufficient mix of investments that meet a wide variety of participant needs, prudent fiduciaries of defined contribution plans typically create a "menu" of investment options from which participants can choose to invest.  Each investment option is generally a pooled investment product (such as a mutual fund or collective investment trust) offering exposure to a particular asset class or sub-asset class (e.g., large cap equities, mid/small cap equities, international equities, bonds, capital preservation). 2012 ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").  In addition, some plans offer what are known as "target date funds," which include a mix of investments from different asset classes at a risk level that is designed to decline over time as the targeted retirement date approaches.[5]

30.     The Plan in this case offered no single asset class options nor any multi-asset class options tied to a participant's retirement date or risk tolerance.   Instead, it offered only one investment option with an investment mix determined by Defendants.

---

[5] The one-size-fits all investment option in the Plan was not a target-date fund, as it had the same mix of investments regardless of a participant's anticipated retirement date (or risk tolerance).

**ERISA § 404(c)**

31.     ERISA § 404(c) protects a fiduciary from liability for a participant's choice of investments where participants have independent control over their accounts and can invest among different options on the plan's menu. 29 U.S.C. § 1104(c)(1); 29 C.F.R. § 2550.404c-1(d)(2)(i).[6] In order for fiduciaries to qualify for this potential defense, however, participants must be given an opportunity to choose from a "broad range of investment alternatives." 29 C.F.R. § 2550.404c-1(b)(1)(ii). At a minimum, this requires that the plan offer "at least three investment alternatives" with "materially different risk characteristics" that "enable the participant or beneficiary by choosing among them to achieve a portfolio with aggregate risk and return characteristics at any point within the range normally appropriate for the participant or beneficiary." 29 C.F.R. § 2550.404c-1(b)(3)(i)(B); *Jenkins v. Yager*, 444 F.3d 916, 923 (7th Cir. 2006).

32.     Because Defendants have not maintained an investment menu with multiple investment options or allowed participants to exercise any independent control over their accounts, Defendants do not qualify for § 404(c) protection.

## **DEFENDANTS' VIOLATIONS OF ERISA**

I.     **DEFENDANTS ADOPTED AN INAPPROPRIATE ONE-SIZE-FITS-ALL INVESTMENT STRATEGY FOR THE PLAN**

33.     Defendants had a policy that called for 70% of the Plan's assets to be allocated into domestic fixed income options, and 30% into equities. The equity target also included sub-targets of 20% for U.S. equities and 10% in international equities.

---

[6] Even in cases where this defense applies, fiduciaries may still be held liable for imprudent construction of the plan's investment menu. *See* 29 C.F.R § 2550.404c-1(d)(2)(iv).

34.     This one-size-fits-all allocation strategy was inappropriate. As noted above, the Plan had approximately 11,000 to 13,000 participants,[7] *see supra* at ¶ 17, with a wide range of retirement needs and objectives. Based on the amount of plan assets, the average participant account balance was around $50,000, nowhere near enough to retire. But Defendants treated the Plan as if each participant had already accrued enough to retire comfortably, zeroing-in on capital preservation options allowing little opportunity for growth.

35.     In fact, the Plan's target allocations are inappropriate even for participants nearing retirement. Many experts, including one of the managers of the Plan's underlying accounts (Morgan Stanley), recommend that participants have well over 30% of their retirement portfolio allocated towards equities ***at the time they actually retire***, given that retirees generally need their savings to last two to three decades, while recommending that participants further from retirement allocate as much as 96% of their portfolio to equities.[8] Yet, Defendants inexplicably reserved only 30% of the Plan's assets for equities.

36.     Indeed, Defendants failed to meet even this low equities target. As shown by the chart below, Defendants consistently trailed their equity allocation targets, often by wide margins:

|        | **Fixed Income (Target 70%)** | **U.S. Equities (Target 20%)** | **International Equities (Target 10%)** |
|--------|-------------------------------|--------------------------------|------------------------------------------|
| **2013** | 85.75% | 11.03% | 3.22% |
| **2014** | 85.24% | 11.92% | 2.83% |
| **2015** | 77.54% | 19.65% | 2.81% |
| **2016** | 74.44% | 20.93% | 4.63% |

---

[7] A participant can gain eligibility for the Plan at age 21.

[8] *See* Morgan Stanley, *Taking Aim at Target Date Portfolios, available at* https://www.morganstanley.com/articles/target-date-portfolios; *see also* The Vanguard Group, *Target-Date Strategies, available at* https://institutional.vanguard.com/VGApp/iip/site/institutional/investments/TargetDate.

This made an already significant problem even worse. At this asset allocation level, the Plan was virtually guaranteed to, at best, earn returns in line with inflation. Such a strategy is incompatible with meeting a participant's retirement income needs. At a 15% retirement savings rate over a 35-year career, a participant earning investment returns in line with inflation will have set aside less than six years of replacement income—less than a third the length of the average American's retirement, according to the U.S. Census bureau.[9]

37.     Given the investment strategy employed since 2013, and its incompatibility with the financial goals and investment horizon of the Plan's participants, it is reasonable to infer that Defendants failed to engage in a prudent process of investigating the relevant facts and circumstances regarding participants' retirement cash flow needs and overall financial objectives as they related to the Plan necessary to determine a mix of investments with appropriate overall risk and return characteristics. *See* 29 C.F.R. § 2550.404a-1(b).

## II.    DEFENDANTS' INVESTMENT STRATEGY WAS ALSO POORLY EXECUTED

38.     In addition to adopting an imprudent one-size-fits all investment strategy, Defendants compounded their imprudence by executing that strategy poorly.

### *Imprudent Investment in Cash Accounts*

39.     Even among fixed income investments, Defendants failed to undertake appropriate efforts to generate meaningful returns. In 2013, for example, Defendants invested ***$336,814,593, or 58% of the Plan's total assets, in cash and money market accounts earning .01% interest or***

---

[9] *See* https://www.thebalance.com/average-retirement-age-in-the-united-states-2388864 (citing U.S. Census Bureau data) (last accessed July 22, 2019).

*less*.   In 2014, Defendants increased the Plan's investment in cash (or cash equivalents) to a staggering ***$401,076,285, or 66% of the Plan's assets, in accounts earning .05% or less***.[10]

40.      Indeed, ***Defendants left up to tens of millions of dollars each year sitting in bank accounts that returned <u>0%</u>***, with almost $27,000,000 invested in such a no return account in 2016. This further demonstrates that Defendants failed to prudently investigate appropriate investments for the Plan.

41.      There were far better options at comparable levels of risk that would have generated greater returns for participants. Experts have stated for years that principal preservation options within defined contribution plans should include investment vehicles like stable value funds.[11] Like money market funds, stable value funds invest in an underlying portfolio of investment-grade fixed income securities whose principal is guaranteed by the issuer. But stable value funds can generate additional yield by using longer-maturity securities, while avoiding the associated risk of principal loss by purchasing insurance contracts from highly-rated insurance companies guaranteeing the portfolio against loss of principal. Stable value funds thus provide preservation of principal comparable to money market funds while consistently generating greater returns for investors.

---

[10] This pattern continued throughout the statutory period. As of the end of 2016, the Plan still had $173,411,914 invested in cash accounts.

[11] A 2011 study from Wharton Business School, analyzing money market and stable value fund returns from the previous two decades, went so far as to conclude that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011), *available at* http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf; *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plan and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006).

42.     Given the superior yields offered by stable value funds at comparable levels of risk, large plans like the Plan overwhelmingly offer stable value funds as capital preservation vehicles. *See* Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch (Aug. 30, 2013), *available at* http://www.marketwatch.com/story/do-money-market-funds-belong-in-401ks-2013-08-30. "With yields hovering around 0%, money-market funds aren't a prudent choice for a 401(k)." *Id.* [12]  "Most [defined contribution] plans offer a stable value option." METLIFE, *2015 Stable Value Study*, at 3 (2015), *available at* https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money Market/2015_StableValueStudy_exp12-2017.pdf.

43.     The returns that could have been achieved by transferring the Plan's cash investments to a competitive stable value option are illustrated by data from Hueler Analytics. The Hueler Index is the industry standard for reporting and measuring returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds nationwide with assets totaling over $105 billion." *See* http://hueler.com. Hueler data therefore represents a reasonable estimate of the returns of a typical stable value fund. As shown below, the returns of the funds in the Hueler universe on average have far exceeded the returns of the money market funds that Defendants chose for the Plan:

| | Hueler Index | Federated Government Obligations Fund | Morgan Stanley ILF Government Portfolio Fund | Morgan Stanley ILF Government Sec Fund | UBS Liquid Assets Government Fund |
|---|---|---|---|---|---|
| | | | | | |

---

[12] As the Department of Labor has explained, "because every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk . . . ." 29 C.F.R. § 2509.2015-01.

| 2013 | 1.84% | 0.01% | 0.00% | -- | -- |
| 2014 | 1.69% | 0.01% | 0.04% | -- | -- |
| 2015 | 1.77% | 0.01% | 0.01% | -- | 0.14% |
| 2016 | 1.79% | 0.38% | 0.39% | 0.12% | 0.38% |

44.     A prudent fiduciary would have considered higher yielding alternatives (such as a stable value fund) to the cash and money market accounts in which the Plan was invested.  The fact that Defendants failed to do so further evidences an imprudent investment process.[13]

### Failure to Investigate the Lower-Cost Share Classes

45.     Although the Plan largely shunned mutual funds throughout the statutory period, it did invest in two bond funds, the Alliance Bernstein High Income Fund and the Hartford Floating Rate Bond Fund. Defendants failed to procure the lowest-cost share class of both bond funds in the Plan.[14]

46.     There is no material difference between share classes other than the costs. Thus, utilizing the cheapest share class, if available, provides an identical—but less expensive—version of the same investment, including the identical manager and an identical mix of investments within each fund. Given the Plan's size, the Plan had sufficient assets to obtain the lowest-cost share class available at any given time. However, Defendants did not choose the lowest cost share class.

47.     For example, since 2013, Defendants have had over $20 million invested in Class

---

[13] The only conceivable reason to invest in cash or cash equivalents is to ensure sufficient liquidity to pay benefits due if participants seek withdrawals from their accounts. However, this explanation does not justify the Plan's massive investments in cash and cash equivalents. From 2013-2017, the Plan's contributions exceeded the benefit payments (including direct rollovers) made to participants or beneficiaries each year by an average of over $23,000,000. Defendants could have easily paid benefits due from the amount of Plan contributions each year alone, leaving no explanation for their extremely large cash investments.

[14] By way of background, most mutual funds offer multiple classes of shares that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets (like the Plan) and therefore greater bargaining power.

A shares of the Alliance Bernstein High Income Fund, which charge an annual expense ratio of .83%, despite the fact that otherwise identical Z shares of the same fund, with the exact same underlying investments, were available at an expense ratio of .50% for investors who could meet the $2,000,000 investment minimum. Similarly, since 2013 Defendants have had over $15 million of Plan assets invested in Class A shares of the Hartford Floating Rate Bond Fund at an expense ratio of 1.00%, despite the availability of cheaper but otherwise identical Class I shares charging only 0.72% per year that have been available since 2006 to institutional investors such as the Plan, while Class F shares of the Floating Rate Bond Fund charging only 0.66% per year have been available to investors  that meet a $1 million investment minimum since 2017.

48.     Defendants have continued to retain class A shares of these funds, even though the availability of lower-cost options would have been revealed by a reasonable investigation. There is no justification for Defendants' failure to use the lower-cost share class as the higher-cost affords no benefit to participants.

49.     A prudent fiduciary would have taken advantage of less expensive share classes. Indeed, many fiduciaries of other retirement plans did just this. This further supports an inference that Defendants failed to monitor the Plan's expenses through a set of processes that a prudent fiduciary would have engaged in.

III.   **DEFENDANTS' IMPRUDENT INVESTMENT PROCESS HAD SERIOUS CONSEQUENCES FOR THE PLAN, WHICH DEFENDANTS IGNORED**

50.     Defendants' imprudent process for managing the Plan had serious consequences for participants. Defendants' IPS specifies a three-to-five year investment horizon, indicating that the Plan's investments are expected to outperform specified benchmarks over that time period. Yet, the Plan's net investment returns have consistently trailed those of its peers over that time.

Indeed, to say the Plan trailed its peers is an understatement. Based on net investment returns compared to a universe of 674 peer plans with comparable data,[15] the Plan has ranked as *the worst performing plan in the entire country in the two most recent five-year periods* for which data is publicly available. Further, the Plan has *ranked among the five worst plans in the entire country* based on net investment returns *over every recent three-year and five-year cycle* dating back to the beginning of the statutory period:

| | The Plan (ranking out of 674 plans) | Median Plan (337/674) | 10th Percentile Plan (607/674) |
|---|---|---|---|
| **3 -year cycles** | | | |
| **2011-2013** | 3.53% (671/674) | 9.54% | 7.91% |
| **2012-2014** | *4.21% (674/674)* | 12.15% | 9.92% |
| **2013-2015** | 2.76% (672/674) | 7.95% | 6.26% |
| **2014-2016** | 1.86% (673/674) | 4.63% | 3.70% |
| **2015-2017** | 3.50% (670/674) | 7.72% | 6.42% |
| **5-year cycles** | | | |
| **2011-2015** | 2.48% (671/674) | 6.89% | 5.71% |
| **2012-2016** | *3.22% (674/674)* | 8.65% | 7.20% |
| **2013-2017** | *3.80% (674/674)* | 9.55% | 8.06% |

51.    A prudent fiduciary acting in the best interests of the Plan would not have maintained the same flawed investment strategy despite such resoundingly poor results. The Plan was not only the *worst performing plan in the country* among its peers during Defendants' own preferred investment horizon, it trailed even its lowest-performing peers by a significant margin, *consistently underperforming even the 10th percentile plan by a massive three-to-five*

---

[15] This sample includes defined contribution plans with at least $350 million in assets as of the end of 2011, complete Form 5500 filings for each year from 2011-2017, a 1/1-12/31 plan accounting year, and no investment in employer stock. The 2017 data is the most recent data available.

*percentage points per year*. From 2012-2016, **the Plan was the worst performing plan in the country**, **trailing the next lowest-returning plan by almost a full percent**.[16] The Plan did not just trail even its poorest-performing peers, it was lapped by them.

52.     Plaintiffs do not allege that low returns, by themselves, constitute a fiduciary breach. However, the substantial deviation of the Plan's returns from those of **every single other defined contribution plan in the United States** reflects Defendants failed to exercise basic levels of diligence, care, and skill in designing, monitoring, and implementing the Plan's investment strategy that prudent fiduciaries exercise. To make matters worse, participants were held captive to this strategy, as there were no alternative strategies or investments available in the Plan. Had Defendants prudently investigated and evaluated the retirement income needs of participants, and the appropriate overall risk and return characteristics that would be necessary to enable participants to meet those needs, Defendants would have abandoned their unorthodox strategy and replaced it with superior alternatives commonly used in other large retirement plans, or at the very least investigated significantly better performing options with risk characteristics in line with their inappropriate strategy. Defendants also could have offered alternative or additional investment options to Plan participants. If Defendants had taken these measures, they would have materially improved participants' investment options and net performance. Instead, the Plan suffered tens of millions of dollars in lost investment returns, and participants' retirement nest eggs were severely impaired.

---

[16] The 673rd ranked plan returned 4.15% from 2012-2016.

IV.    **PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' INVESTMENT PROCESS AND OTHER MATERIAL FACTS PRIOR TO SUIT.**

53.    Plaintiff did not have knowledge of all material facts (including, among other things, the asset allocation of the Plan compared to similar plans, the Plan's poor returns compared to other similar plans, Defendants' failure to re-evaluate the Plan's investment strategy after poor performance, the availability of stable value funds and higher performing capital preservation options, the availability of lower-cost share classes, Defendants' failure to investigate such higher-performing options and lower-cost share classes, the terms of the IPS, and Defendants' failure to meet the asset-allocation targets in the IPS) until shortly before this suit was filed. Further, Plaintiff does not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, and evaluating their unorthodox investment strategy and Defendants' processes for selecting, monitoring, and removing investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

54.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

55.     Plaintiff asserts his claims in Counts I and II on behalf of a class of participants and beneficiaries of the Plan defined as follows:[17]

> All participants and beneficiaries of the DeMoulas (Restated) Profit Sharing Plan and Trust at any time on or after July 30, 2013, excluding Defendants, the Trustees, or any other employees with responsibility for the Plan's investment or administrative functions, and members of Defendants' Board of Directors.

56.     <u>Numerosity</u>:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had over 10,000 participants during the applicable period.

57.     <u>Typicality</u>:     Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is a Plan participant and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants' imprudent decisions affected all Plan participants similarly.

58.     <u>Adequacy</u>:     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

59.     <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

> a.   Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

> b.   Whether Defendants breached their duty to monitor other Plan fiduciaries;

---

[17] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

c.   The proper form of equitable and injunctive relief;

d.   The proper measure of monetary relief.

60.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

61.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal or replacement of particular Plan investments or removal or replacement of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

62.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual

22

basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duty of Prudence
### 29 U.S.C. § 1104(a)(1)(B)

63.     Defendants DeMoulas and the Trustees are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

64.     29 U.S.C. § 1104 imposes a duty of prudence upon Defendants in their administration of the Plan and in selecting and monitoring the Plan's investments.

65.     Among other things, Defendants were responsible for maintaining investments that would meet the needs of participants, prudently selecting quality investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, ensuring that the Plan's fees were reasonable, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

66.     As described throughout this Complaint, Defendants breached their fiduciary duties and failed to employ a prudent process for selecting, monitoring, and reviewing the Plan's investments. Defendants adopted a one-size-fits-all investment strategy for the Plan without regard for participant needs and failed to prudently execute that strategy by choosing poorly-performing options when better performing options would have been revealed by a reasonable investigation. Defendants also imprudently retained poorly-performing investments and failed to appropriately

23

monitor their performance. In addition, Defendants failed to investigate lower-cost share classes available to them, opting for higher-cost investments with no benefit to participants. Further, Defendants placed an extremely high level of Plan assets in cash accounts earning little or no interest when comparable superior options would have been revealed by a reasonable investigation into alternative options.

67.     Each of the above actions and omissions described in paragraph 66 and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

68.     Each Defendant is personally liable, and jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches.  In addition, Defendants are subject to other equitable relief as provided by ERISA.

69.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## **COUNT II**
### **Failure to Monitor Fiduciaries**

70.     As alleged throughout the Complaint, Defendants (including the Trustees) are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

71.     DeMoulas is responsible for appointing and removing the Trustees.

72.     Given that DeMoulas, through its Board of Directors, had overall oversight responsibility for the Plan, and the explicit fiduciary duty to appoint, monitor, and remove the Trustees, DeMoulas had a fiduciary responsibility to ensure that the Trustees acted prudently at all times.

73.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

74.     To the extent that DeMoulas' fiduciary monitoring responsibilities were delegated, this monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently.

75.     DeMoulas breached its fiduciary monitoring duties by, among other things:

    a.  Failing to monitor and evaluate the performance of the Trustees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Trustees' imprudent actions and omissions with respect to the Plan;

    b.  Failing to monitor the Trustees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

25

    c.    Failing to remove Trustees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings; and

    d.    Failing to cause the Trustees to reconsider or revise their flawed investment strategy.

76.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses per year due to excessive fees and investment underperformance.

77.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), DeMoulas is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.  In addition, DeMoulas is subject to other equitable relief as provided by ERISA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, as representative of the Class defined herein, and on behalf of the Plan, prays for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties under ERISA;

D.    A declaration that Defendant DeMoulas breached its fiduciary duty to monitor the Trustees;

E.    A declaration that Defendants have no defense to liability under ERISA § 404(c);

F.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

J.    An award of such other and further relief as the Court deems equitable and just.

Dated: July 30, 2019

**BLOCK & LEVITON LLP**

By: /s/ Jason M. Leviton
Jason M. Leviton (BBO #678331)
Amanda R. Crawford (BBO #703325)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jason@blockesq.com
amanda@blockesq.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 22084X*
Kai H. Richter, MN Bar No. 0296545*
Brock J. Specht, MN Bar No. 0388343*
Carl F. Engstrom, MN Bar No. 0396298*
Brandon T. McDonough, MN Bar No. 0393259*
Ben J. Bauer, MN Bar No. 0398853*

*pro hac vice applications forthcoming*

27

4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
cengstrom@nka.com
bmcdonough@nka.com
bbauer@nka.com

ATTORNEYS FOR PLAINTIFFS