# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Paul Toomey, as representative of a class of similarly situated persons, and on behalf of the DeMoulas (Restated) Profit Sharing Plan and Trust,

*Plaintiff,*

v.

DeMoulas Super Markets, Inc., Arthur T. Demoulas, William F. Marsden, and William J. Shea,

*Defendants.*

Case No. 1:19-cv-11633-LTS

Hon. Leo T. Sorokin

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Sarah E. Walters (BBO # 638378)
McDermott Will & Emery LLP
28 State Street
Suite 3400
Boston, MA 02109
(617) 535-4000 (office)

Margaret H. Warner (Admitted *Pro Hac Vice*)
Jennifer B. Routh (Admitted *Pro Hac Vice*)
Matthew A. Waring (Admitted *Pro Hac Vice*)
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000 (office)

# TABLE OF CONTENTS

Table of Authorities ............................................................................................. ii

Introduction ......................................................................................................... 1

Background .......................................................................................................... 2

    A.   Overview of Demoulas Super Markets ...................................................... 2

    B.   The Profit Sharing Plan ............................................................................. 3

Argument .............................................................................................................. 4

I.    The Complaint Fails To State A Claim For Breach Of The Duty Of
Prudence. ....................................................................................................... 5

    A.   Plaintiff Has Not Plausibly Alleged that the Plan's Investment
Policy Was Imprudent. .............................................................................. 6

        1.   Plaintiff fails to state a claim related to the Plan's lack of
self-directed investment choices. ..................................................... 8

        2.   Plaintiff fails to state a claim related to the Plan's
conservative investment strategy. ................................................. 11

        3.   Plaintiff fails to state a claim based on the Plan's alleged
deviation from its asset allocation target. .................................... 13

    B.   Plaintiff Has Not Plausibly Alleged that the Plan's Investment in
Cash Equivalents Was Imprudent. ......................................................... 14

    C.   Plaintiff Has Not Plausibly Alleged that the Share Classes Used
in the Plan Were Imprudent. ................................................................. 17

II.   The Complaint Fails To State A Claim For Breach Of The Duty To
Monitor. ....................................................................................................... 19

Conclusion ......................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Arivella v. Lucent Techs., Inc.,*
  623 F. Supp. 2d 164 (D. Mass. 2009) .................................................................... 10

*Barchock v. CVS Health Corp.,*
  886 F.3d 43 (1st Cir. 2018) ........................................................................... *passim*

*Braden v. Wal-Mart Stores, Inc.,*
  588 F.3d 585 (8th Cir. 2009) ............................................................................... 19

*Brotherston v. Putnam Invs., LLC,*
  907 F.3d 17 (1st Cir. 2018) ................................................................................. 14

*Bunch v. W.R. Grace & Co.,*
  555 F.3d 1 (1st Cir. 2009) ................................................................................... 13

*Chao v. Merino,*
  452 F.3d 174 (2d Cir. 2006) .................................................................................. 6

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,*
  228 F.3d 24 (1st Cir. 2000) ................................................................................... 3

*Edes v. Verizon Commc'ns, Inc.,*
  417 F.3d 133 (1st Cir. 2005) ............................................................................... 11

*Ellis v. Fidelity Management Trust Co.,*
  883 F.3d 1, 10 (1st Cir. 2018) ............................................................................. 12

*Farias v. Mass. Laborers' Health & Welfare Fund,*
  2018 WL 340031 (D. Mass. Jan. 9, 2018) ........................................................... 10

*Friend v. Sanwa Bank Cal.,*
  35 F.3d 466 (9th Cir. 1994) ................................................................................. 14

*Hecker v. Deere & Co.,*
  556 F.3d 575 (7th Cir. 2009) ..................................................................... 8, 17, 19

*Herman v. NationsBank Tr. Co. (Ga.),*
  126 F.3d 1354 (11th Cir. 1997) ............................................................................. 9

*Hughes Aircraft Co. v. Jacobson,*
  525 U.S. 432 (1999) ............................................................................................. 8

*Jenkins v. Yager,*
  444 F.3d 916 (7th Cir. 2006) ........................................................................... 7, 12

*Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP,*
  2012 WL 701397 (S.D.N.Y. Mar. 6, 2012) ........................................................... 19

*Loomis v. Exelon Corp.,*
  658 F.3d 667 (7th Cir. 2011) ............................................................................... 18

*Pledger v. Reliance Tr. Co.,*
  240 F. Supp. 3d 1314 (N.D. Ga. 2017) ................................................................ 16

**Cases—continued**

*Sacerdote v. New York Univ.,*
    2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)................................................. 18, 19

*Schatz v. Republican State Leadership Comm.,*
    669 F.3d 50 (1st Cir. 2012).................................................................................. 5

*Varity Corp. v. Howe,*
    516 U.S. 489 (1996) ............................................................................................ 7

*Velazquez v. Mass. Fin. Servs. Co.,*
    320 F. Supp. 3d 252 (D. Mass. 2018) ........................................................... 19, 20

*White v. Chevron Corp.,*
    2017 WL 2352137 (N.D. Cal. May 31, 2017) ..................................... 16, 17, 18, 19

*The Woodward Sch. For Girls, Inc. v. City of Quincy,*
    13 N.E.3d 579 (Mass. 2014) .............................................................................. 7


**Statutes and Regulations**

I.R.C. § 401(k) ........................................................................................................ 9

29 U.S.C.

    § 1022(a)............................................................................................................ 10

    § 1104(a)(1)(B) ............................................................................................... 5, 6

    § 1104(c)(1)(A) ................................................................................................... 9

    § 1113 ................................................................................................................ 10

Revenue Act of 1978, § 135 Pub. L. No. 95-600, 92 Stat. 2763 ................................... 9

29 C.F.R. § 2550.404a-1(b)(2)(i)............................................................................... 7

57 Fed. Reg. 46,906 (Oct. 13, 1992)............................................................................ 9


**Other Authorities**

David F. Babbel & Miguel A. Herce, *Stable Value Funds Performance,*
    Risks, Feb. 21, 2018........................................................................................... 17

Restatement (Third) of Trusts § 90 (2007) ................................................................ 7

## INTRODUCTION

This lawsuit is fundamentally misconceived.  The provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") invoked in the Complaint provide a remedy for plaintiffs who allege that the fiduciaries of their retirement plans managed those plans improperly.  But Plaintiff Paul Toomey's quarrel is not with how his retirement plan was managed.  Rather, the theory of his Complaint is that his former employer, Defendant Demoulas Super Markets, Inc. ("DSM" or the "Company"), offered him the wrong type of retirement plan in the first place.  That claim is not cognizable under ERISA and must be dismissed, along with Plaintiff's tagalong challenges to the plan's investment strategy and specific plan investments.

DSM, which operates 80 grocery stores in Massachusetts, New Hampshire and Maine, is a family-owned and operated business with a loyal workforce.  For more than five decades, DSM has maintained the Demoulas Profit Sharing Plan and Trust (the "Plan"), a tax-qualified retirement plan covering all of its associates[1] who are 21 years or older and have completed 1,000 hours of service during a plan year. The Company annually contributes at least 15% of participants' eligible compensation to the Plan and invests those contributions on their behalf.  The Company's Board and Plan trustees established an Investment Policy to operate hand in hand with the Company's generous employer contributions.  The Investment Policy seeks to preserve the value of the Company's contributions while providing some modest investment growth.  This

---

[1] DSM refers to its employees as "associates".

approach has been highly successful, and the Plan achieved results during the putative class period consistent with the Investment Policy.

Plaintiff argues that, in lieu of the Plan as structured, ERISA required Defendants to provide him with a completely *different* type of plan—a 401(k)-style retirement plan that would allow participants to select investment options with differing levels of risk—and to employ a less conservative investment strategy. He is mistaken. ERISA does not require all plan fiduciaries to offer the same type of plan or follow the same investment strategy. On the contrary, a fiduciary's duty under ERISA is to make prudent decisions in light of the objective and purpose of the particular plan that the fiduciary administers. Here, the Plan's structure and investment strategy were aligned with preserving the value of DSM's profit-sharing contributions for the benefit of DSM associates; indeed, Plaintiff does not suggest otherwise. The Court should reject Plaintiff's argument that the Plan was required to look like other retirement plans with different purposes and funding approaches, and it should dismiss his complaint with prejudice.

## BACKGROUND

### A.    Overview of Demoulas Super Markets

Demoulas Super Markets is a family-owned, family-run business that began with a single, small food store in Lowell, Massachusetts in 1917. Over the last 100 years, that single store in Lowell grew into a regional supermarket chain with over 25,000 associates. In 1963, the Company established the Plan under the leadership of Telemachus Demoulas. His vision was to allow associates to benefit directly from the earnings they helped make possible.

B.    The Profit Sharing Plan

Throughout the class period, the Company annually contributed 15% of participants' eligible compensation to the Plan[2]; in earlier years, the Company's contribution was as much as 20%.  Annual contributions are allocated to individual accounts on a pro rata basis based on the ratio of a participant's eligible compensation for the plan year, compared to the eligible compensation of participants for the plan year.  The Plan is funded solely by the Company; associates "are not permitted to contribute their own money to the Plan."  Compl. ¶ 17.

A stated objective in the Investment Policy "is to preserve the economic value of Plan assets" to ensure that the funds set aside and invested are there when they need them.  Ex. B at 5.[3]  The Plan also seeks to "[m]aintain liquidity in Plan assets sufficient to minimize the possibility of a realized investment loss occasioned by the need to make current benefit payments and pay Plan expenses."  *Id.*  In light of these objectives, the Investment Policy calls for a conservative investment approach that aims at achieving a rate of return on Plan assets, net of management and administrative expenses, that exceeds the Consumer Price Index (CPI) by at least one percentage point, thus

---

[2]    See, *e.g.*, Ex. A at 33 (2017 IRS Form 5500 for the Plan).  This publicly-filed document is judicially noticeable.  *See, e.g.*, *White v. Chevron Corp.*, 2017 WL 2352137, at *5 (N.D. Cal. May 31, 2017) (taking judicial notice of Forms 5500).

[3]    The Court may consider the Investment Policies at the pleading stage, given that Plaintiff relies on them for his allegations about the Plan's investment strategy and asset allocation.  *See, e.g.*, *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (noting that on motion to dismiss, a court "may properly consider the relevant entirety of a document integral to" the complaint or that the plaintiff has "relied upon . . . in framing the complaint") (internal quotation marks omitted).

preserving the value of these assets against inflation and market downturns while offering Plan participants the opportunity for modest growth. *Id.* at 6.

To achieve this rate of return while avoiding unnecessary risk, the Investment Policy establishes an asset allocation target of approximately 70% of Plan assets invested in fixed-income and cash or cash-equivalent assets, with the remainder in equities. The Investment Policy permits substantial deviations from these targets, however. The Investment Policy in effect from 2006 until December 2015 provided that as much as 85% of Plan assets could be invested in fixed-income investments, and it stated that "[i]t is understood that deviations" from that maximum allocation "may occur periodically as a result of cash flows, market impact or short-term decisions" by the fiduciaries. Ex. B at 6. The Investment Policy in effect from December 2015 onward set an even wider range of permissible asset allocations, allowing as much as 100% of Plan assets to be held in fixed-income investments, including cash and cash-equivalent assets. Ex. C at 7. Like the 2006 Investment Policy, the 2015 Investment Policy stated that "[m]arket changes, acquisitions, contributions and cash flow needs from time to time may dictate flexibility for the asset allocations to vary materially from targets." *Id.*

## ARGUMENT

In ruling on a motion to dismiss under Rule 12(b)(6), a court "take[s] the complaint's well-pleaded facts as true, and [it] draw[s] all reasonable inferences in the plaintiffs' favor." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018). In order to be considered well-pleaded, a complaint's factual allegations "must be 'non-conclusory' and 'non-speculative.'" *Id.* (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)). "To survive dismissal," the complaint "must

4

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted).

The Complaint here flunks that test. Courts have held repeatedly that allegations of fiduciary breach like the ones that Plaintiff asserts in Count I of the Complaint fail to state a claim under ERISA. And the failure-to-monitor claim in Count II is entirely dependent on the flawed allegations in Count I. The Complaint must therefore be dismissed in its entirety.

## I.     THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE DUTY OF PRUDENCE.

Section 404(a) of ERISA imposes a duty on a fiduciary to manage the plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Count I alleges that Defendants breached this duty of prudence by (1) failing to offer Plan participants a menu of different investments; (2) adopting an improperly conservative investment strategy; (3) investing portions of the Plan's assets in cash-equivalent assets, such as money market funds; and (4) failing to investigate the possibility of investing in different share classes of two bond funds. Compl. ¶ 66.

These allegations fail to state a claim. Plaintiff's burden is to allege facts showing that Defendants did not act with the prudence that a fiduciary "would use in the conduct of an enterprise . . . with *like aims*." 29 U.S.C. § 1104(a)(1)(B) (emphasis added). And his allegations do not satisfy that burden. Plaintiff does not allege that a prudent

fiduciary with "like aims" would have acted differently from Defendants; rather, his position is that the Plan had the wrong "aims."

### A. Plaintiff Has Not Plausibly Alleged that the Plan's Investment Policy Was Imprudent.

The first fault that the Complaint identifies is the Plan's reliance on a single, conservative investment strategy for all Plan assets. Plaintiff alleges that the 30-70 split between equity and fixed income investments called for in the Investment Policy did not provide sufficient growth to "meet[] . . . participant[s'] retirement income needs" (Compl. ¶ 36) and that, as a result of this "flawed investment strategy," the Plan generated lower returns during the putative class period than an unspecified "sample" of other "defined contribution plans." *Id.* ¶¶ 50 n.15, 51. He argues that instead of following a "one-size-fits-all allocation strategy" (*id.* ¶ 34), Defendants should have offered Plan participants "a 'menu' of investment options designed to meet a wide range of needs" (*id.* ¶ 3).

These allegations do not state a viable duty-of-prudence claim. ERISA itself is not "one-size-fits-all"; it does not require fiduciaries to provide a menu of investment options or to follow a particular investment strategy. *See, e.g., Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) ("[S]o long as the 'prudent person' standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable.") (internal quotation marks omitted). Instead, ERISA's duty of prudence directs fiduciaries to give "appropriate consideration" to whether a "particular investment or investment course of action is reasonably designed . . . to further *the purposes of the plan*" they administer. 29 C.F.R. § 2550.404a-1(b)(2)(i) (emphasis

added); *see, e.g., Jenkins v. Yager*, 444 F.3d 916, 925 (7th Cir. 2006) ("[T]he adequacy of a fiduciary's independent investigation and ultimate investment selection is evaluated in light of the character and aims of the particular type of plan he serves.") (internal quotation marks omitted).

That context-specific approach parallels the common law of trusts, from which ERISA's fiduciary duties "draw much of their content." *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996). Trust law has long recognized that different investments and investment strategies may be appropriate for different trusts. Accordingly, rather than requiring all trustees to follow the same approach, trust law directs a trustee to select investments "as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the [particular] trust." Restatement (Third) of Trusts § 90 (2007); *see also, e.g., The Woodward Sch. For Girls, Inc. v. City of Quincy*, 13 N.E.3d 579, 589 (Mass. 2014) ("[A] trustee must exercise reasonable care, skill, and caution in investing and managing trust assets as a prudent investor would, considering the purposes, terms, and other circumstances of the trust.") (internal quotation marks and brackets omitted).

Thus, Plaintiff cannot state a claim of imprudence by alleging that the Plan did not employ the same strategy, offer the same investment options, or yield the same investment returns as "typical defined contribution plan[s]" (Compl. ¶ 3)—many of which have quite different objectives from the Plan and few of which are *solely* funded by employer contributions. Rather, he must allege that the Plan's structure and

investment strategy was imprudent in light of the structure and purpose of the Plan. He has not done so.[4]

### 1. Plaintiff fails to state a claim related to the Plan's lack of self-directed investment choices.

To begin with, Plaintiff's claim that it was imprudent for Defendants not to offer Plan participants a "'menu' of investment options" (Compl. ¶ 3) is meritless. And in any event, it is time-barred; by his own admission, Plaintiff had actual knowledge of that aspect of the Plan more than three years before he filed suit.

a. Plaintiff's demand for a menu of investments fails to state a claim on the merits. The Plan is not intended to provide participants with a vehicle for self-directed retirement savings, akin to a Section 401(k) plan; indeed, as noted above, participants are not permitted to make any contributions. Rather, the objective of the Plan is to allow the Company to make contributions of its own funds to participants' accounts and to preserve the value of those contributions while achieving modest growth.

Given that the Plan is not meant to be a self-directed retirement vehicle for associates, it was entirely prudent for Defendants to invest the Plan assets in a single, conservative mix of investments. Indeed, that is how the vast majority of retirement plans worked at the time ERISA was enacted—which was four years before Congress

---

[4] Defendants do not concede that the Company's decisions regarding the Plan's structure and investment strategy are subject to Section 404 of ERISA at all. *See, e.g.*, *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999) ("ERISA's fiduciary duty requirement simply is not implicated . . . [by] a decision regarding the form or structure of the Plan."); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("We . . . question whether [an employer's] decision to restrict the direct investment choices in its Plans is even a decision within Deere's fiduciary responsibilities."). This motion assumes that they are, however, because it is clear that Plaintiff cannot state a duty-of-prudence claim in any event.

8

created the modern 401(k) plan. *See* Revenue Act of 1978, § 135 Pub. L. No. 95-600, 92 Stat. 2763, 2785 (adding what is now I.R.C. § 401(k)).  And ERISA clearly contemplated that a retirement plan could comply with the duty of prudence without offering participants the option to direct how their accounts are invested.  It included, in Section 404(c), a safe harbor from fiduciary liability for plans that allow participants to "exercise[] control over the assets in [their] account[s]."  29 U.S.C. § 1104(c)(1)(A).  It would have been pointless for Congress to create a special safe harbor for the subset of plans that allow participants to choose their own investments if, as Plaintiff argues, ERISA required *all* plans to permit self-direction by participants.

To the extent that the statute leaves any room for doubt on this point, the U.S. Department of Labor has interpreted the statute to permit plans to forgo offering participants a menu of investments from which to choose.  *See* Final Regulation Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans), 57 Fed. Reg. 46,906, 46,907 (Oct. 13, 1992) ("[A] plan which does not meet the requirements for an ERISA section 404(c) plan may, nonetheless, have a prudent and well diversified investment portfolio.").  *See, e.g.*, *Herman v. NationsBank Tr. Co., (Ga.)*, 126 F.3d 1354, 1363 (11th Cir. 1997) ("Unless Congress, in enacting ERISA, demonstrated clearly its intent with regard to the questions before us, we must defer to the Secretary[] [of Labor]'s official interpretations of ERISA if they are reasonable.").  Thus, Plaintiff's claim that ERISA *required* Defendants to offer participants a menu of investment options—rather than choosing a single investment strategy tailored to the Plan's asset-preservation goals—fails as a matter of law.

b.      Section 413 of ERISA bars claims for breach of fiduciary duty that are brought more than "three years after the earliest date on which the plaintiff had actual knowledge of the breach." 29 U.S.C. § 1113. Under this statute of limitations, Plaintiff's claim regarding Defendants' failure to offer him a menu of investment options is time-barred.

The Complaint itself makes this clear. Plaintiff alleges that he was a participant in the Plan until 2015, when he left the Company and "his account was distributed." Compl. ¶ 12. And he alleges that, "[w]hile a participant, [he] was not given any choice of investments and was subject to Defendants' investment decisions." *Id.*[5] In short, no later than the time he left the Company in 2015—more than three years before he filed this lawsuit—Plaintiff actually knew that the Plan did not offer participants the ability to choose from a menu of investment options.

That actual knowledge precludes Plaintiff from bringing a duty-of-prudence claim now based on that aspect of the Plan. *See, e.g., Arivella v. Lucent Techs., Inc.*, 623 F. Supp. 2d 164, 173 (D. Mass. 2009) (Young, J.) ("[P]ursuant to the three-year limitation of section 413(2), a plaintiff has actual knowledge of an ERISA violation when he or she

---

[5]      As required under ERISA, participants were provided with a summary plan description describing the provisions of the Plan. See 29 U.S.C. § 1022(a). Section 3 of the summary plan description distributed to participants stated that "[o]ur Trustees are responsible for the selection and management of Plan investments." Ex. D at 3. The court can consider the summary plan description at the pleading stage, given Plaintiff's reference throughout his complaint to the terms of the Plan. *See, e.g., Farias v. Mass. Laborers' Health & Welfare Fund*, 2018 WL 340031, at *3 (D. Mass. Jan. 9, 2018) ("Because the complaint and the proposed amended complaint reference the insurance health care coverage plaintiff obtained through the Fund, this court can consider the Fund's Summary Plan Description of the health care coverage when deciding the motion to dismiss.").

is aware of the essential facts of the transaction or conduct constituting the violation.")
(internal quotation marks omitted). Thus, the Court should dismiss Count I to the
extent it challenges the Plan's lack of self-directed investment options. *See, e.g., Edes
v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) (dismissing a fiduciary-duty
claim as time-barred).

> ## 2. Plaintiff fails to state a claim related to the Plan's conservative investment strategy.

Plaintiff's claim that the Plan should have pursued a more aggressive investment
strategy is also belied by the purposes of the Plan. DSM is a family-run business, rooted
in a particular geographic area, and committed to the welfare of its associates, many of
whom stay with the Company for decades. Under the terms of the Plan, DSM annually
sets aside significant contributions to associates' retirements and seeks to preserve this
money so that it is there for participants when they need it. Thus, the purpose of the
Plan, as reflected in the Investment Policy, is not to pursue aggressive investment gains
above all else, as Plaintiff would have it. Rather, as noted above, the purpose of the
Plan is to protect DSM's profit-sharing contributions against loss, while enabling the
Plan assets to grow enough to outpace inflation and thus retain their purchasing power
along with modest growth.

Although Plaintiff complains that the Plan's conservative investment strategy
was *generally* inappropriate, he has not alleged that it was imprudent *in light of the
Plan's objective* of preserving the Company's substantial profit-sharing contributions—
an omission that is fatal to his claim. And even if Plaintiff had alleged that a

conservative strategy was inappropriate for the Plan, that allegation would fail as a matter of law.

The First Circuit and other courts have held that it is entirely prudent for a fiduciary to pursue a conservative strategy when doing so is in line with a plan's or fund's objectives. The First Circuit's decision in *Ellis v. Fidelity Management Trust Co.* is illustrative. There, the plaintiffs argued that a fiduciary's use of a government- and corporate-bond index as a benchmark for its stable value fund was imprudent because it was "too conservative." 883 F.3d 1, 10 (1st Cir. 2018). The court rejected that argument. It noted that the very purpose of a stable value fund is to be a conservative investment that preserves the value of an investor's principal. *Id.* at 9. Given that fact, the court reasoned, "it is completely unclear by what standard a jury could find a disclosed choice of benchmark to be imprudent as 'too conservative.'" *Id.* at 10. The same is true here: Because the Plan's principal objective was to preserve the contributions that were allocated to participants' accounts, there is no room under Section 404(a) of ERISA for a claim that the Plan's investment strategy was too conservative. *See, e.g., Jenkins*, 444 F.3d at 925 ("[The fiduciary's] strategy was to find long-term, conservative, reliable investments that would do well during market fluctuations. . . . We cannot say such a strategy was unreasonable or imprudent.").[6]

---

[6]     Given that Plaintiff's challenge to the conservatism of the Plan's investment strategy does not state an ERISA claim, his allegation that the Plan generated lower investment returns than an unspecified "sample" of 674 "defined contribution plans" (Compl. ¶ 50 & n.15) is irrelevant. Plaintiff does not allege that these 674 plans followed the same conservative strategy as the Plan, making any comparison between their returns and the Plan's returns pointless. In any event, the prudence test "is one of *conduct,* and not a test of the result of performance of [an] investment." *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (internal quotation marks omitted). Thus,

### 3.    *Plaintiff fails to state a claim based on the Plan's alleged deviation from its asset allocation target.*

The Complaint alleges that the Plan failed to invest 30% of its assets in equities, as required by its Investment Policy. *See, e.g.*, Compl. ¶¶ 35-36.  Plaintiff does not appear to assert that this alleged failure was an independent breach of the duty of prudence—but if he did, that claim, too, would warrant dismissal for two reasons. *First*, the 30% equity target for the Plan is not an absolute requirement, as Plaintiff assumes. As noted above, at all relevant times, the Investment Policy permitted investment of as low as 15% in equities and acknowledged that downward deviations from even that level were expected to occur.  Given that the Investment Policy did not set hard-and-fast requirements for asset allocation at any time during the class period, Plaintiff's allegations regarding the Plan's asset allocation do not state a plausible claim that Defendants breached the terms of the Plan.  And at minimum, Plaintiff cannot state a claim with respect to the years after 2015, when the applicable Investment Policy expressly permitted the *entirety* of the Plan to be invested in fixed-income investments if the fiduciaries so chose.  Ex. C at 7.

*Second*, in order to state a claim for breach, Plaintiff must allege that he suffered a loss, in that the value of his account is lower than it would have been if the trust had been "properly administered."  *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 31 (1st Cir. 2018) (emphasis and internal quotation marks omitted); *see also, e.g.*, *Friend v. Sanwa Bank Cal.*, 35 F.3d 466, 469 (9th Cir. 1994) ("ERISA holds a trustee liable for a

---

Plaintiff cannot state a claim by alleging that the Plan's investments ultimately performed poorly; he must instead allege that they were imprudently chosen in light of the circumstances and purpose of the Plan, which he has not done.

breach of fiduciary duty only to the extent that losses to the plan result from the breach."). Plaintiff does not allege that the Plan's purported failure to meet its equities target caused him such a loss. The benchmark in the Investment Policy calls for the Plan to generate a long-term return that exceeds the CPI inflation rate by 1% (Ex. B at 5), and Plaintiff does not allege that the Plan ever failed to meet this performance target. (Nor could Plaintiff make any such allegation—the Plan met the CPI + 1% goal stated in the Investment Policy over the course of the class period.) Indeed, Plaintiff does not claim that the alleged underinvestment in equities had any effect on participants *at all*, apart from a conclusory statement that the Plan's alleged underinvestment in equities diminished the "opportunity for growth" in participant accounts. Plaintiff accordingly has not stated any claim based on the Plan's alleged deviation from its target asset allocation.

### B. Plaintiff Has Not Plausibly Alleged that the Plan's Investment in Cash Equivalents Was Imprudent.

The Court can quickly dispense with Plaintiff's next theory of imprudence—that Defendants acted imprudently by allegedly investing Plan assets in cash-equivalent investments, such as money market accounts, instead of considering the alternative of higher-yielding stable value funds. Compl. ¶ 44. The First Circuit already has rejected a materially identical theory under Rule 12(b)(6).

In *Barchock v. CVS Health Corp.*, plaintiffs alleged that a fiduciary of a stable value fund in a 401(k) plan acted imprudently by "investing 'too much' of the fund's assets in short-term debt obligations equivalent to cash, as opposed to intermediate-term investments that generally provide higher returns." 886 F.3d 43, 46 (1st Cir.

2018).  The plaintiffs argued that imprudence could be inferred from the fact that the fund's cash allocation "was a 'severe outlier' when compared to allocation averages for the stable value industry."  *Id.*  But the court held that these allegations were insufficient to state a claim.  It explained, citing its earlier decision in *Ellis*, that "conservativism in the management of a stable value fund—when consistent with the fund's objectives disclosed to the plan participants—is no vice."  *Id.* at 50.  And it held that the plaintiffs' allegation that the amount of cash in the fund was high compared with other stable value funds added nothing to the plausibility of their claim, because even taking that allegation into account, the plaintiffs had not "offer[ed] a theory for determining . . . how much [cash] liquidity is 'too much.'"  *Id.* at 54-55.

Plaintiff's challenge to the money market funds in the Plan is on all fours with the claim that *Barchock* rejected.  Like the plaintiffs in *Barchock*, Plaintiff alleges that Defendants should have allocated less money to cash-equivalent investments and instead chased higher-yield options.  The result here should thus be the same as in *Barchock*:  Rather than accepting Plaintiff's invitation to decide what kind of investment vehicle is "too conservative" in this context, the Court should hold that Defendants' choice of money market funds for a portion of the Plan was "no vice," and not an indicator of imprudence.  *Barchock*, 886 F.3d at 50.  Indeed, given that the Plan is a profit-sharing plan with the principal goal of asset preservation, the use of cash-equivalent investments here is even less suggestive of imprudence than it was in *Barchock*, which involved a 401(k) plan.

Outside of this circuit, courts also have rejected the kind of claim that Plaintiff makes here.  Particularly instructive is *White v. Chevron Corp.*, in which the court

dismissed a claim that it was imprudent for a 401(k) plan to offer a money market fund instead of a stable value fund. The court explained that "[a] fiduciary may reasonably select an investment alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option." 2017 WL 2352137, at *10. And it held that, in light of the different attributes of money market funds and stable value funds, the fact that a fiduciary chooses the former over the latter is not indicative of imprudence. The court noted, in this regard, that the purported performance gap between the two kinds of investments "may narrow in the future" under different interest rate conditions, and that stable value funds come with "risks, restrictions, and other downsides"—such as their exposure to longer-term securities— that money market funds avoid. *Id.* (internal quotation marks omitted); *see also, e.g.,* *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1333 (N.D. Ga. 2017) (finding *White* "persuasive" and dismissing claim that fiduciaries "failed to consider including a stable value fund in the Plan by weighing the benefits of a stable value fund compared to a money market fund").

Plaintiff attempts to get around decisions such as *Barchock* and *White* by alleging that fiduciaries have no reason to prefer money market funds over higher-yielding stable value funds, because stable value funds and money market funds have "comparable levels of risk." Compl. ¶ 42. But Plaintiff offers no support for that assertion. None of the sources Plaintiff cites actually states that stable value funds carry lower risk than money market funds. On the contrary, the latest version of one study he cites acknowledges that "[a]n individual [stable value] fund may exhibit greater volatility and risk to investors" than money market funds would. David F.

Babbel & Miguel A. Herce, *Stable Value Funds Performance*, Risks, Feb. 21, 2018, at 36. Thus, the inclusion of money market funds in the Plan does not indicate that Defendants acted imprudently in managing the Plan. Plaintiff's duty-of-prudence claim based on the Plan's investment in money market funds should accordingly be dismissed.

### C.     Plaintiff Has Not Plausibly Alleged that the Share Classes Used in the Plan Were Imprudent.

Plaintiff's final theory of imprudence is that, with respect to two bond funds accounting for *roughly 4-6%* of Plan assets, Defendants allegedly "failed to procure the lowest-cost share class" available. Compl. ¶ 45. But courts have repeatedly dismissed such allegations, and Plaintiff's allegations should meet the same fate.

"[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker*, 556 F.3d at 586. On the contrary, "fiduciaries have latitude to value investment features other than price," and "indeed are required to do so" in order to fulfill their responsibility to consider the factors relevant to an investment decision. *White*, 2017 WL 2352137, at *11. Thus, the mere allegation that there was a cheaper alternative to a fund in a plan does not state a claim that the plan fiduciary acted imprudently.

As numerous courts have held, there are several reasons why "prudent fiduciaries may very well choose to offer retail class shares over institutional class shares," even when "both versions have identical portfolio managers, underlying investments, and asset allocation." *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017). Retail funds are "open to the public," making it easy for fiduciaries and participants to track and assess their performance and "giv[ing] participants the

benefits of competition." *Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011). Retail funds may include services, such as recordkeeping, that a plan would have to pay for separately if it chose an "institutional" fund. *White*, 2017 WL 2352137, at *14 (noting that plan's retail share classes for certain funds "paid the Plan's recordkeeping expenses"). And most important of all, "retail class shares necessarily offer higher liquidity than institutional investment vehicles." *Sacerdote*, 2017 WL 3701482, at *11; *see also Loomis*, 658 F.3d at 672 ("[I]nstitutional investment vehicles come with a drawback: lower liquidity."). Given these considerations, courts have repeatedly dismissed duty-of-prudence claims based on bare allegations that a plan included retail share classes of mutual funds rather than institutional share classes. *See, e.g., Loomis*, 658 F.3d at 672 (noting lower liquidity of institutional funds and holding that "[i]t is not clear that participants would gain from lower expense ratios at the cost of lower liquidity"); *Hecker*, 556 F.3d at 586 (affirming dismissal where plan offered retail funds with expense ratios as high as 1%, noting that "the [retail] expense ratios necessarily were set against the backdrop of market competition"); *Sacerdote*, 2017 WL 3701482, at *11 (holding that inclusion of retail share classes rather than institutional share classes of the same funds "does not constitute evidence of imprudence"); *White*, 2017 WL 2352137, at *14 ("[M]erely alleging that a Plan offers retail-class rather than institutional-class funds is insufficient to state a claim for breach of the duty of prudence.").

A number of courts have allowed claims related to retail share classes to go forward—but they have generally done so only where the plaintiff alleged that the fiduciary chose retail share classes for self-interested reasons. *Velazquez v. Mass. Fin.*

*Servs. Co.*, 320 F. Supp. 3d 252, 258 (D. Mass. 2018) ("The principal distinguishing feature between the two lines [of cases] is whether or not self-dealing is alleged."); *see also Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*, 2012 WL 701397, at *3 (S.D.N.Y. Mar. 6, 2012) ("[A]llegations of self-dealing are what set apart judicial decisions . . . where the courts concluded that the plaintiff had not stated a claim, from those . . . where the courts allowed the plaintiffs' claims to go forward."). For example, in *Velazquez*, Judge Zobel held that the plaintiff had stated a claim by alleging that the retail share class funds in her retirement plan were the fiduciary's proprietary funds and that the fiduciary had included those funds for its own financial gain. 320 F. Supp. 3d at 259-60. Similarly, in *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009), the court held that the plaintiff had stated a claim because he alleged that the retail share class funds in his plan "were chosen to benefit the trustee"—which received revenue sharing payments from those funds—"at the expense of the participants."

Plaintiff's complaint does not allege self-dealing by the Plan's fiduciaries; instead, he asks the Court to "infer[]" (Compl. ¶ 49) that Defendants breached their fiduciary duty based on the mere allegation that the Plan included two retail share class funds (out of the *hundreds* of Plan investments). The Court should dismiss his claim, as other courts presented with such threadbare allegations have done.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE DUTY TO MONITOR.

Count II alleges that DSM failed to monitor the activities of the Plan's trustees. This claim is wholly derivative of the inadequate duty-of-prudence claims in Count I, and accordingly must also be dismissed. *See, e.g.*, *Velazquez*, 320 F. Supp. 3d at 260 ("A

claim for failure to monitor is derivative of the underlying breach."); *see also Barchock*, 886 F.3d at 55 (affirming dismissal of failure-to-monitor claim because no fiduciary-duty claim had been stated against the fiduciaries themselves).

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be granted and the complaint dismissed with prejudice.

Dated: September 27, 2019      Respectfully submitted,

/s/ Sarah E. Walters
Sarah E. Walters (BBO # 638378)
MCDERMOTT WILL & EMERY LLP
28 State Street, Suite 3400
Boston, Massachusetts 02109
(617) 535-3800
sewalters@mwe.com

Margaret H. Warner (Admitted *Pro Hac Vice*)
Jennifer B. Routh (Admitted *Pro Hac Vice*)
Matthew A. Waring (Admitted *Pro Hac Vice*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000
mwarner@mwe.com
jrouth@mwe.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants in this case as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 27, 2019.

/s/ *Sarah E. Walters*

Sarah E. Walters